**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 08a0508n.06
Filed: August 19, 2008

No. 07-5023

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| JASON JORDAN, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| TYSON FOODS, INC.; TYSON FOODS, | ) | MIDDLE DISTRICT OF TENNESSEE |
| INC. GROUP HEALTH PLAN; IBP | ) | |
| WELFARE BENEFITS PLAN; IBP, INC., | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

Before:  **ROGERS and McKEAGUE, Circuit Judges; ADAMS, District Judge.**[*]

**ROGERS, Circuit Judge.**  Plaintiff Jason Jordan appeals the district court's order granting summary judgment to his former employer, Tyson Foods, Inc.  Jordan brought an action for statutory damages under the Employee Retirement Income Security Act of 1974 ("ERISA") claiming that Tyson failed to comply with its duty to provide him with certain documents related to Tyson's Group Health Plan.  The district court determined that Jordan could not seek statutory damages under ERISA because Jordan did not have standing as a "participant" in the Tyson Plan.  In the alternative, the district court concluded that it would exercise its discretion not to award statutory damages.  For the reasons stated below, we affirm.

---

[*]The Honorable John R. Adams, United States District Judge for the Northern District of Ohio, sitting by designation.

**I.**

Many of the preliminary facts relevant to Jordan's instant claim against Tyson were summarized adequately by this court in a related case known as *Jordan II*.[1] For ease of reference, we repeat them here.

> Plaintiff began employment as a general laborer with Defendant IBP, inc. on April 23, 2001. As a result of his employment, Plaintiff was able to enroll in two employee benefit plans offered by IBP, the IBP Welfare Benefits Plan ("the IBP Plan") and the Short Term Disability Plan ("the STD Plan"), which were in effect until September 30, 2002. The required fees for membership in these plans were automatically deducted from Plaintiff's paycheck.
>
> On June 6, 2002, Jordan applied for and was granted a medical leave of absence for emotional problems. According to the IBP Plan, the following provision governed plan benefits for employees who are on a leave of absence:
>
>> Leave of Absence
>>
>> Subject to the FMLA leave provisions discussed below, you may continue coverage (including independent coverage) for up to 12 continuous months while on an approved medical leave, and for one month in the case of personal leave. Applicable contributions must continue to be made to the Plan in order to retain coverage during your leave of absence. If you do not return to work at the end of the approved leave period, then your coverage will terminate, unless continued in accordance with the COBRA continuation provisions.
>
> The FMLA provisions referenced above state, in pertinent part:

---

[1]The case is known as "*Jordan II*" because Jordan also filed a separate suit against Tyson for, among other things, discrimination under the Americans with Disabilities Act. That case is known as "*Jordan I*" and was stayed pending the outcome of *Jordan II* and the instant case.

> If you choose to continue coverage while on an approved leave made available under the Family and Medical Leave Act ("FMLA"), you may do so by paying any required contributions that would have been paid if you had been working. If you fail to pay any required contribution, coverage will terminate on the last day of the period for which contributions were paid.

Because Plaintiff was not receiving monthly paychecks during his leave of absence, his fees were not being automatically deducted from his paychecks every month. Plaintiff did receive short-term disability checks during this leave, but fees were not taken from these checks to pay Plaintiff's premiums. Typically, IBP sent a packet to an employee on a leave of absence as a reminder that fees are still due in order to stay enrolled in the benefits programs. This packet contained, among other information, "coupons" that allowed an employee to continue coverage for up to twelve months while on a leave of absence by paying monthly fees. Plaintiff's packet, however, was sent to a previous address instead of Plaintiff's current address. Plaintiff did not pay his premiums while he was on medical leave. However, the IBP Plan continued to pay his medical claims through September 30, 2002, when Defendant Tyson Foods, Inc. ("Tyson") acquired IBP. Thereafter, Tyson replaced the IBP Plan with the Tyson Foods, Inc. Group Health Plan ("the Tyson Plan").

Tyson only allowed employees whose payments were up-to-date in the IBP Plan to enroll in the Tyson Plan. This policy was not expressly stated in the Tyson Plan's written Group Health Plan Description. On October 4, 2002, Plaintiff completed the enrollment form and was allowed to enroll in the new Tyson Plan. Plaintiff also provided his new address on this form. In November of 2002, Tyson deducted the premiums for the plan from one of Plaintiff's short-term disability checks. On November 26, 2002, Tyson realized that Plaintiff's premium payments were in arrears with respect to the IBP Plan and, thus, that his application for the Tyson Plan never should have been accepted. He was therefore "disenrolled" from the Tyson Plan retroactive to October 1, 2002.

On December 10, 2002, Plaintiff's attorney and his mother both contacted Tyson on Plaintiff's behalf to attempt to have his benefits restored. On the same day, Plaintiff's attorney, Charles Yezbak, sent two letters on Plaintiff's behalf to Travis Fredrickson and Paul Kirchner at IBP. The letters requested that Plaintiff's benefits be reinstated immediately. On January 7, 2003, Yezbak wrote another letter to Kirchner stating that his previous communications had been ignored and demanding again that Plaintiff's coverage be reinstated. Kirchner responded that day and explained as follows:

> [Plaintiff] received a short-term disability check in November, and the following deductions were taken in error as part of that check:

- 3 -

$15.00 (1 week) for the 10-02 Plan and $27.81 (3 weeks at $9.27 week) under the old Plan. The latter deduction was applied to three-fourths of the July premium, the most recent arrearage. Consequently, a portion of July's premium was left unpaid along with all of the premiums for August and September. This leaves your client with no medical coverage for part of July, and all of August and September, under the Group Medical Plan for IBP, unless he pays the arrearage of $80.37 in full.

As of October 1, 2002, the company completed its merger of the Group Medical Plan Coverage for the entire company. That Plan provides that team members on a leave of absence with your client's seniority are allowed to make continuation payments for three months ($180), and if these payments are made, then the team member will receive a COBRA notice at the end of the three month period. Since [Plaintiff] is in arrears for a substantial portion of October and all of November and December, he should pay for that time period as well so that he has no break in coverage. The total payment needed to maintain his coverage without interruption would be $260.37. Otherwise, upon return to work, [Plaintiff] will be able to participate in the Medical Benefit Plan upon payment of his premiums with a break in coverage for any period of unpaid premiums.

Kirchner wrote another letter on January 15, 2003 reminding Yezbak to advise him of what Plaintiff planned to do about his benefits. On January 31, 2003, Plaintiff was terminated when he failed to return to work after his medical leave expired. On February 21, 2003, Yezbak contacted Kirchner formally requesting a number of documents pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq*. (2000), and appealing Tyson's denial of Plaintiff's benefits. In a letter from Yezbak dated March 21, 2003, Plaintiff made a Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), 29 U.S.C. § 1161, *et seq*. (2000), election to continue his benefits. Plaintiff never attempted to make premium payments pursuant to this COBRA election.

On April 15, 2003, Tyson responded to Plaintiff's appeal. Tyson stated that Plaintiff did not give timely notification of his change of address and that he did not make a timely election of COBRA coverage. Tyson offered to reimburse Plaintiff for the money that was deducted from Plaintiff's short-term disability checks to pay for premiums for the Tyson Plan. On June 3, 2003, after hiring new counsel, Plaintiff appealed the April 15, 2003 response. He sent a follow-up letter to Tyson on August 15, 2003, stating that if the matter was not settled by September 15, 2003, he would file suit under ERISA.

> After several settlement offers were made by Tyson and rejected by Plaintiff, Tyson sent a final administrative determination to Plaintiff on April 28, 2005. In the letter, Tyson conceded that there was some uncertainty about Plaintiff's last known address at the time the COBRA election notice was sent. Due to this uncertainty, Tyson offered Plaintiff the opportunity to elect COBRA continuation coverage for the maximum COBRA continuation period beginning on October 1, 2002 since Plaintiff was covered under the IBP Plan before that date. Plaintiff was required to elect COBRA continuation coverage within sixty days and to pay the applicable premiums within forty-five days of election. The total cost of premiums for the entire coverage period was $3,631.86. Plaintiff objected to the proposed start date of COBRA continuation coverage and asserted that coverage should have started on January 31, 2003, the date of Plaintiff's termination. Tyson responded that the start date had not been contested earlier and that it was appropriate due to Plaintiff's reduction in hours. On June 25, 2005, Plaintiff filed a complaint in federal district court alleging violations of the COBRA notice provisions under 29 U.S.C. § 1132 *et seq*.

*Jordan v. Tyson Foods, Inc.*, 257 F. App'x 972, 973-76 (6th Cir. 2007) (hereinafter "*Jordan II*") (footnotes and citations omitted). The filing of that complaint initiated the *Jordan II* case.

During discovery in *Jordan II*, Tyson produced, on January 31, 2006, four documents to supplement the administrative record: (1) the Summary Plan Description for the Tyson Plan; (2) Jordan's October 4, 2002 enrollment form for the Tyson Plan; (3) an August 9, 2002 envelope addressed to Jordan's former address, which had contained the packet regarding the fee payments required of Jordan during his leave of absence, and which was returned to IBP as undeliverable; and (4) a December 17, 2002 email written by Tyson's Director of Group Insurance.

After Tyson produced these documents, Jordan sought to amend his *Jordan II* complaint to add a new claim alleging that Tyson had failed to timely provide the documents pursuant to the previous document request that Jordan's counsel had made on February 21, 2003. On that date, and

as discussed in the facts recited above, Jordan's counsel sent a letter to Tyson to appeal the denial

of his medical and short-term disability benefits. In the letter, Jordan's counsel stated:

> I am formally requesting pursuant to 29 U.S.C. § 1132 *et seq*. (ERISA) a true,
> complete and accurate copy of the following: (1) the Plan Document; (2) the
> Summary Plan Description; (3) the administrative record; and (4) the name and
> contact number of the plan administrator. This request is applicable [to] all medical
> plans and disability plans applicable to Mr. Jordan.

Pursuant to this request, Tyson provided Jordan with a copy of the Summary Plan Description for

the IBP Employee Welfare Benefits Plan, the Short Term Disability Plan for Employees of IBP,

payroll and disability payment reports produced by IBP, and COBRA administrative records

maintained by IBP. Tyson did not provide to Jordan the four documents later produced during

discovery in *Jordan II*.

In his motion to amend the *Jordan II* complaint, Jordan asserted that Tyson's earlier failure

to produce the four documents at issue warranted statutory damages under 29 U.S.C. §

1132(c)(1)(B). That statutory provision provides that a plan administrator who fails to comply with

a request for any information that the administrator is required to furnish to a participant may be, in

the court's discretion, found personally liable to the participant for statutory damages. Jordan

contended that the document requests made in the February 21, 2003 letter should have been

construed as including the four documents later produced by Tyson during discovery in *Jordan II*.

Accordingly, Jordan argued that he was entitled to statutory damages in the amount of $110 per day,

for 1,045 days, for each of the four documents at issue. Rather than consolidating this claim with

Jordan's COBRA-based claim in *Jordan II*, the district court severed the claim into a separate case.


On December 1, 2006, a magistrate issued a report and recommendation with respect to Jordan's § 1132(c)(1)(B) claim. The magistrate concluded, based on a previous report and recommendation issued in *Jordan II*, that Jordan was never a "beneficiary or participant" in the Tyson Plan, and thus did not have standing to bring the instant suit against Tyson.[2] The magistrate stated that "[i]t can readily be seen from the plain language of § 1132(c)(1)(B), that only participants or beneficiaries have rights under that statute. Because Jordan was never a participant or a beneficiary of the Tyson Plan, he has no rights against Defendant Tyson Foods, Inc., under § 1132(c)(1)(B)." In the alternative, the magistrate concluded that even if Jordan qualified as a participant with respect to the Tyson Plan, the district court should exercise its discretion not to award statutory damages. The magistrate based this recommendation on two grounds. First, the magistrate noted that the February 21, 2003 letter from Jordan's counsel never asked specifically for the Summary Plan Description for the Tyson Plan, and that Tyson was not required to furnish, under 29 U.S.C. § 1024(b)(4), the other three documents at issue. Second, the magistrate reasoned that, in any event, Jordan had suffered no prejudice from the alleged failure to provide the documents.

---

[2]In *Jordan II*, the district court concluded that Jordan was not a participant in the Tyson Plan because he had not paid his premiums for the IBP plan and because his benefits had terminated in July or August 2002 as a result. Accordingly, the district court reasoned that Jordan was not eligible for coverage under the Tyson Plan based on Tyson's policy of only allowing employees whose payments were up-to-date in the IBP Plan to enroll in the Tyson Plan. As discussed more fully in Part II.A., *infra*, this court disagreed with that determination on appeal.

On December 8, 2006, Jordan filed objections to the magistrate's report and recommendation. On December 13, 2006, the district court overruled Jordan's objections and adopted the magistrate's report and recommendation, thereby granting summary judgment to Tyson. In the interim, the district court also issued a judgment in favor of Tyson in *Jordan II*. Jordan appealed that judgment and, on December 19, 2007, this court affirmed on the merits in that case. *Jordan II*, 257 F. App'x at 978-81.

## II.

Because Jordan was not entitled to statutory damages under 29 U.S.C. § 1132(c)(1)(B) for Tyson's failure to provide three of the four documents at issue, and because the district court did not abuse its discretion in refusing to award statutory damages with respect to the fourth document, the district court properly denied relief in this case.

## A.

As a preliminary matter, and contrary to the district court's conclusion, Jordan has statutory standing as a "participant" in the Tyson Plan for purposes of the instant case. Under 29 U.S.C. § 1132(c)(1)(B), a person must be either a "beneficiary" or "participant" to be entitled to statutory damages for a plan administrator's failure to comply with a request for information. In this case, the dispute centers on whether Jordan was a participant in the Tyson Plan when he requested the documents at issue, as Jordan concedes that he was not a beneficiary. Title 29 U.S.C. § 1002(7) defines "participant" to mean

> any employee or former employee of an employer, or any member or former member of an employee organization, who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer or members of such organization, or whose beneficiaries may be eligible to receive any such benefit.

The Supreme Court has interpreted this definition to include:

> employees in, or reasonably expected to be in, currently covered employment or former employees who have . . . a reasonable expectation of returning to covered employment or who have a colorable claim to vested benefits. In order to establish that he or she may become eligible for benefits, a claimant must have a colorable claim that (1) he or she will prevail in a suit for benefits, or that (2) eligibility requirements will be fulfilled in the future.

*Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 117-18 (1989) (internal citations and quotation marks omitted) (alteration in original); *see also Morrison v. Marsh & McLennan Cos., Inc.*, 439 F.3d 295, 303-04 (6th Cir. 2006) (noting that a "colorable claim to vested benefits" is a reasonable claim that (1) a person will prevail in a suit for benefits; or (2) eligibility requirements will be fulfilled in the future). In this case, Jordan does not claim to have a reasonable expectation of returning to covered employment or that eligibility requirements will be satisfied in the future. Thus, the determination of whether Jordan has standing as a participant turns on whether he had a colorable claim for vested benefits under the Tyson Plan at the time that he requested the documents at issue. We review de novo the district court's determination of that issue. *Zirnhelt v. Mich. Consol. Gas Co.*, 526 F.3d 282, 290 (6th Cir. 2008).

On December 17, 2007, a panel of this court determined in *Jordan II* that Jordan was indeed a participant in the Tyson Plan for purposes of his COBRA-based claims against Tyson. *Jordan II*, 257 F. App'x at 977-978. Though Jordan had been disenrolled from the Tyson Plan because he failed to pay premiums under the IBP Plan while on leave of absence, the panel nevertheless determined that Jordan had a "colorable claim" for vested benefits under the Tyson Plan because Jordan had alleged that his failure to pay premiums was due to IBP's failure to provide him with notice of the duty to pay premiums. Based on this allegation, the panel concluded that Jordan could possibly establish that IBP was the "but for" cause of his lack of coverage under the Tyson Plan. Had IBP notified Jordan of his duty to pay premiums while on leave of absence, the court reasoned, Jordan might have properly enrolled in the Tyson Plan and, accordingly, might have been entitled to benefits under that plan. Consequently, the panel concluded that Jordan's claim was "'not so insubstantial that it fail[ed] to present a federal controversy.'" *Jordan II*, 257 F. App'x at 978 (quoting *Moore v. Lafayette Life Ins. Co.*, 458 F.3d 416, 445 (6th Cir. 2006)). On the merits, however, the panel ultimately held that Jordan's non-payment of premiums was not attributable to IBP and that Tyson's decision to deny Jordan benefits was not arbitrary or capricious. *See id.* at 979-81.

The analysis of the standing issue in *Jordan II* is directly applicable to the instant case. Here, Jordan brought a claim alleging that Tyson improperly failed to produce certain documents that he had requested on February 21, 2003. Though Jordan was no longer an employee of Tyson at the time of the document request, Jordan's document request was made in connection with his claim that he

was entitled to benefits under the Tyson plan that allegedly inured to him *prior* to his termination on January 31, 2003. This is the same claim to benefits that formed the basis of Jordan's suit in *Jordan II*, and, in that case, this court concluded that Jordan's allegations of IBP's wrong-doing were enough to establish that Jordan had a colorable claim to those benefits. Because the document request that forms the basis of the instant case was made in connection with the same colorable claim to benefits involved in *Jordan II*, Jordan has standing as a participant to seek statutory damages in this case. Simply stated, at the time that he requested the relevant documents, Jordan had a colorable claim to vested benefits under the Tyson Plan. *Cf. Davis v. Featherstone*, 97 F.3d 734, 738 (4th Cir. 1996) (holding that plaintiff who had a colorable claim for benefits at the time that he made his request for information was a participant able to bring suit under § 1132(c)(1)(B)).

Furthermore, while it is true that Jordan's claim to benefits ultimately proved unsuccessful in *Jordan II*, the ultimate success or failure of that claim has no bearing on the standing inquiry here. Indeed, as this court has previously stated,

> [i]n determining who is a "participant," for purposes of standing, the definition found in 29 U.S.C. § 1002(7) must be read in the context of traditional concepts of standing, not in the context of adjudicating the ultimate issue of the merits of plaintiffs' claim that they are not receiving the full extent of the benefits to which they are entitled from the employee benefit plan which is paying them . . . benefits.

*Astor v. Int'l Bus. Machs. Corp.*, 7 F.3d 533, 538 (6th Cir. 1993); *see also Zirnhelt*, 526 F.3d at 290 ("Even though [plaintiff's] claim for benefits failed in the end, she still had a 'colorable' claim.").

Thus, regardless of whether his claim to benefits was ultimately successful on the merits, Jordan's claim to benefits was "colorable" enough to establish standing in this case.

For the reasons stated above, Jordan has statutory standing as a "participant" to bring the instant § 1132(c)(1)(B) claim against Tyson.

**B.**

Though Jordan has standing to seek statutory damages under § 1132(c)(1)(B), he is not entitled to statutory damages for Tyson's alleged failure to produce three of the four documents at issue, namely: (1) Jordan's October 4, 2002 enrollment form for the Tyson Plan; (2) the August 9, 2002 envelope addressed to Jordan's former address; and (3) the December 17, 2002 email by Tyson's Director of Group Insurance. ERISA requires that a plan administrator

> shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary plan[] description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated.

29 U.S.C. § 1024(b)(4). In turn, § 1132(c)(1)(B) authorizes statutory damages if the plan administrator fails to comply with a request for such information. The district court in this case concluded that three of the documents requested by Jordan—the enrollment form, envelope, and email—do not fit within the terms of § 1024(b)(4) and, as a result, that Tyson's failure to produce those documents did not warrant statutory damages under § 1132(c)(1)(B). We agree.

It is undisputed that the three documents at issue do not constitute a summary plan description, annual report, terminal report, bargaining agreement, trust agreement, or contract. The only contention that remains available to Jordan is that these documents constitute "other instruments under which the plan is established or operated." But any contention in that regard lacks merit. This court has held that the term "other instruments" in § 1024(b)(4) "is . . . properly limited to those class of documents which provide a plan participant with information concerning how the plan is *operated.*" *Allinder v. Inter-City Prods. Corp. (USA)*, 152 F.3d 544, 549 (6th Cir. 1998). In *Allinder*, the plaintiff brought suit against her former employer under § 1132(c) when the employer refused to complete a claim form necessary for the plaintiff to file a long-term disability insurance claim. *Id.* at 545. This court rejected the plaintiff's contention that the administrator's failure to produce the form warranted § 1132(c) damages, concluding that the term "other instruments" does not include "documents used in the *ministerial day-to-day processing* of individual claims." *Id.* at 549. A similar conclusion follows in this case with respect to the enrollment form, envelope, and email. Because none of these documents fall within the "class of documents which provide a plan participant with information concerning how the plan is *operated,*" Jordan may not recover statutory damages under § 1132(c) for Tyson's failure to provide those documents.

Jordan does not contest this point with respect to the email and envelope. He does contend, however, that the enrollment form fits within the terms of § 1024(b)(4) because "[i]t documented the benefits in which he had enrolled, the premiums for the benefits he had elected and the effective date of his coverage." But this contention fails to establish that the enrollment form constitutes an

instrument "under which the plan is established or operated." And contrary to Jordan's assertions, this court's holding in *Bartling v. Fruehauf Corp.*, 29 F.3d 1062 (6th Cir. 1994), does not require a different conclusion. Although the *Bartling* court stated that "all other things being equal, courts should favor disclosure where it would help participants understand their rights," *id.* at 1070, all other things are not equal in this case. The documents at issue in *Bartling* involved actuarial reports that were "indispensable to the operation of the plan" and a written calculation procedure that detailed the procedures followed to derive benefits under the plan. *Id.* at 1069-71. Such documents are more easily considered "instruments under which the plan is . . . operated" than the enrollment form at issue here. Indeed, Jordan's plan enrollment form is more like the claim form at issue in *Allinder* than the documents at issue in *Bartling*. Like a claim form, an enrollment form is not "indispensable to the operation of the plan," but rather serves a ministerial function. Both forms may be related to the receipt of benefits, but neither concerns the operation of the plan as contemplated in § 1024(b)(4). The mere fact that Jordan's enrollment form contained some information related to benefits and premiums does not alter this conclusion.

Recognizing the difficulty associated with this § 1024(b)(4) argument, Jordan submits an alternative argument. He contends that even if Tyson's failure to produce the enrollment form, email, and envelope does not warrant damages pursuant to § 1024(b)(4), a participant may seek § 1132(c)(1)(B) relief for 29 C.F.R. § 2560.503-1(h) disclosure violations. Jordan's contention in this regard, however, is foreclosed by controlling case law.

Section 2560.503-1 is an ERISA regulation that implements 29 U.S.C. § 1133. That statute sets out requirements for employee benefit plans, stating that all plans must provide adequate notice in writing when a claim for benefits has been denied and must afford a reasonable opportunity for a full and fair review of the decision to deny. Section 2560.503-1(h)(2)(iii) implements the "full and fair review" requirement of § 1133 by providing that the claims procedure of a benefits plan must provide a claimant, "upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits." Jordan argues that Tyson violated this provision by failing to produce the documents at issue in this case, and asks this court to hold that he may recover § 1132(c)(1)(B) damages for this regulatory violation.

This court has previously held that "a plan administrator cannot violate § 1133 and thus potentially incur liability under § 1132(c)," because § 1133 imposes requirements for the benefits plan rather than obligations on the plan administrator. *Stuhlreyer v. Armco, Inc.*, 12 F.3d 75, 79 (6th Cir. 1993) (citing *VanderKlok v. Provident Life & Accident Ins. Co., Inc.*, 956 F.2d 610, 618 (6th Cir. 1992)). Consistent with *Stuhlreyer*, cases in other circuits have rejected the argument that § 1132(c) statutory damages are available for violations of regulations implementing § 1133. In *Wilczynski v. Lumbermens Mutual Casualty Co.*, 93 F.3d 397 (7th Cir. 1996), the Seventh Circuit noted that "section 1133, on its face, establishes requirements for plans, not plan administrators." *Id.* at 406. The court acknowledged that a previous case in that circuit, *Kleinhans v. Lisle Savings Profit Sharing Trust*, 810 F.2d 618 (7th Cir. 1987), had "indicated that, under specific circumstances, certain violations of section 1133 by a plan administrator may give rise to liability under section

1132(c)." *Wilczynski*, 93 F.3d at 406. But the court distinguished *Kleinhans* by noting that the implementing regulation at issue in that case, 29 C.F.R. § 2560.503-1(f) (1977), was phrased in terms that imposed duties on plan administrators. In contrast, the implementing regulation at issue in *Wilczynski*, 29 C.F.R. § 2560.503-1(g) (1977), involved requirements for what benefit plans must provide. *See* 93 F.3d at 406. Accordingly, the court rejected the plaintiff's attempt to recover § 1132(c) damages for the alleged violation of the implementing regulation, concluding that, "[a]s applied to this case, therefore, the obligations of section 1133 are imposed only on benefit 'plans.'" *Id.* Here, plaintiff relies on a regulation that sets out plan requirements (29 C.F.R. 2560.503-1(h)(2)(iii)), and thus this case is more like *Wilczynski* than *Kleinhans*.

Moreover, although the *Wilczynski* court initially distinguished *Kleinhans* on the facts, the Seventh Circuit also stated in that case its agreement with the Third Circuit's analysis in *Groves v. Modified Retirement Plan*, 803 F.2d 109 (3d Cir. 1986). *See* 93 F.3d at 406-07. In *Groves*, the Third Circuit flatly rejected the contention that the damages authorized against plan administrators in § 1132(c) includes damages for breaches of regulations. The Third Circuit relied on the penal as opposed to remedial nature of § 1132(c)(1)(B). 803 F.2d at 117. The court went on to explain that § 1132(c)(1)(B) authorizes damages for breaches of duties imposed "by this subchapter," and that the "by this subchapter" languages precludes recovery for violations of implementing regulations. *Id.* at 117-18. This analysis appears inconsistent with the *Kleinhans* conclusion distinguished in *Wilczynski*, thus bringing into question whether *Kleinhans* survives even in the Seventh Circuit. Notably, the only case that Jordan relies on as explicitly allowing such an application of § 1132(c)

is *Zanella v. Principal Mutual Life Insurance Co.*, 878 F. Supp. 144, 147 (E.D. Wis. 1995), a case which relied on *Kleinhans*.

This court cited *Groves* with approval in *Stuhlreyer*, though its approval did not extend to the "by this subchapter" analysis, but rather was limited to the court's distinction between the plan and the plan administrator. In this case, there is no need to apply *Groves*'s broader "by this subchapter" holding because the regulatory provision upon which Jordan relies, 29 C.F.R. § 2560.503-1(h)(2)(iii), clearly imposes requirements on the plan, not the plan administrator. Jordan's argument is thus foreclosed by the plan/plan administrator distinction articulated in *Stuhlreyer*.[3]

## C.

Finally, the district court did not abuse its discretion in refusing to award statutory damages to Jordan for Tyson's failure to produce the Tyson Plan Summary Plan Description (SPD).[4] In denying Jordan's request for money damages, the magistrate concluded that Jordan suffered no prejudice with respect to the alleged failure to provide the documents. This appears correct. Aside

---

[3]Moreover, even assuming for the sake of argument that Jordan could recover § 1132(c) damages for Tyson's failure to provide the email, envelope, and enrollment form, we would nevertheless conclude, for the reasons stated in Part II.C., *infra*, that the district court did not abuse its discretion in refusing to award statutory damages for Tyson's failure to provide those documents.

[4]The parties agree that the Tyson Plan SPD falls within the purview of § 1024(b)(4). Although there is some question as to whether the letter of February 21, 2003, can be construed as including a request for the Tyson Plan SPD, we need not address that question because, even if the letter is so construed, the district court did not abuse its discretion in refusing to award statutory damages.

from unsupported contentions in his brief, Jordan has not offered any evidence that he was prejudiced by Tyson's actions. Indeed, during oral argument, counsel for Jordan was not able to articulate any appreciable harm that flowed from Tyson's failure to produce the SPD. As the magistrate noted in his report, all of the documents at issue in this case were made available to Jordan as part of the *Jordan II* case long before Jordan filed his dispositive motion in that case. Consequently, Jordan's mere assertions that Tyson's actions forced him to retain additional counsel and contributed to a delay in Tyson's offer to provide benefits are not sufficient to cause this court to be "firmly convinced" that the district court made a mistake in declining to impose statutory damages. *See Bartling*, 29 F.3d at 1068 (standard of review).

Moreover, Jordan has not demonstrated that Tyson acted in bad faith when it originally failed to provide the Tyson Plan SPD. In his brief, Jordan avers that Tyson "had a financial incentive to withhold the Tyson Plan SPD." But Jordan points to no evidence to support this claim, and there is nothing in the record indicating bad faith on Tyson's part. It is true that an email written in December 2002 by Tyson's Director of Insurance stated that Jordan "should not have insurance coverage and we should not give him the opportunity to pay the premiums." But this statement hardly conveys bad faith, much less establishes that Tyson acted in bad faith in responding to a document request that Jordan made months after the email was written. Indeed, Jordan's letter of February 21, 2003, did not even specifically name the Tyson Plan SPD (or, for that matter, any of the other documents at issue), but instead ambiguously requested "the Summary Plan Description."

This lack of specificity makes it entirely plausible that Tyson simply did not understand the scope of Jordan's document request.

Further, it is significant that, after Tyson failed to produce the Tyson Plan SPD, Jordan never notified Tyson that its response to the letter of February 21, 2003 was inadequate. In fact, after the initial request, Jordan's counsel wrote a subsequent letter on June 3, 2003, in which he stated that the administrative record was incomplete and requested that the record be supplemented by various documents. In that letter, however, Jordan's counsel did not request the Tyson Plan SPD or otherwise complain of Tyson's failure to produce the SPD. It was not until almost three years after the initial request, during litigation in *Jordan II*, that the failure to produce the Tyson Plan SPD became an issue. And Jordan cannot seriously argue that he was not aware of the existence of the Tyson Plan SPD at the time of the initial request. Jordan had enrolled himself in the Tyson Plan prior to the document request of February 21, 2003, and had appealed his denial of benefits under that same plan. Because Jordan failed to notify Tyson that its response was inadequate, Tyson had no reason to doubt the sufficiency of its response to Jordan's letter. On these facts, there is no basis from which this court can conclude that the district court abused its discretion in declining to assess statutory damages. This conclusion is supported by our holding in *Crosby v. Rohm & Haas Co.*, 480 F.3d 423, 432 (6th Cir. 2007), that the district court in that case did not abuse its discretion where defendant had no reason to doubt the sufficiency of the response, any delays resulted from good faith mistakes, and plaintiff had failed to establish prejudice.

## III.

For the foregoing reasons, we affirm.